[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 12, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-14112
Non-Argument Calendar

_____

D.C. Docket No. 03-00242-CR-CB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PERRY LAMAR BOOKER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(May 12, 2005)

Before BLACK, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Perry Lamar Booker directly appeals his conviction and 84-month sentence for knowingly possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Booker argues on appeal that (1) the district court abused its discretion in denying his pretrial motion for the government to reveal the identity of the confidential informant ("CI"); (2) the court erred in denying his pretrial motion to suppress evidence seized as the result of a search conducted of his residence; (3) the evidence at trial was insufficient to support his § 922(g)(1) conviction; and (4) the district court violated his Sixth Amendment right to a jury trial in enhancing his sentence, pursuant to U.S.S.G. § 2K2.1(b)(5), based on facts that neither were proven to a jury beyond a reasonable doubt, nor admitted by Booker, in light of Blakely v. Washington, 542 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and United States v. Booker, 543 U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). For the reasons set forth more fully below, we affirm Booker's conviction, but we vacate and remand for resentencing consistent with the Supreme Court's decision in Booker.

A federal grand jury returned an indictment, charging Booker with the above-referenced offense and one count of possession with intent to distribute 1.5 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1). Booker filed a pretrial motion to compel the government to produce, among other things, (1) the

2

identity and criminal history of the CI on whom local law enforcement officers had relied in obtaining a state search warrant for Booker's residence, and (2) the date and time of the controlled buy during which this CI allegedly bought drugs from Booker at this residence. The government responded that the controlled buy occurred on July 15, 2003, at approximately 1:30 p.m. The government, however, refused to identity the CI, arguing that Booker had failed to make a showing sufficient to overcome the government's privilege in maintaining the CI's secrecy. The government also responded that it was concerned for the CI's safety because (1) Monroeville, Alabama—the location of the controlled buy—was a small community; and (2) Booker had threatened to retaliate against the CI.

Booker also moved pretrial for the court to suppress evidence local law enforcement agents seized as the result of their search of Booker's residence, including the firearms at issue in the offense of conviction. Booker contended that, although the search was conducted pursuant to a warrant, the affidavit supporting the warrant failed to establish that the CI was reliable or that law enforcement officials had independently corroborated the CI's information. He generally argued, as well, that the affiant may not have revealed to the magistrate all of the relevant facts necessary to assess the CI's reliability.

In support of his motion to suppress this evidence, Booker attached a copy of the affidavit of Alfred Carter, an officer with the Monroe County Sheriff's Office, submitted in seeking the search warrant for Booker's residence, person, and vehicle, which contained the following attestations:

> A [CI] that has provided me, Alfred Carter, with accurate and reliable information in the recent past has provided me with information that the [CI] has completed numerous purchases of crack cocaine from Perry Booker at Jones Trailer Park Lot 28. Agents met with the [CI] and provided him with U.S. Currency to make a controlled buy from Perry Booker at Lot 28, Jones Trailer Park. Agents searched the [CI] and the [CI]'s vehicle for contraband, then sent the [CI] to Perry Booker's residence. Agents followed and observed the [CI] go to Lot 28, Jones Trailer Park. Agents then followed the [CI] back to the predesignated location for debriefing. The [CI] handed over to Agent Carter 3 pieces of solid rock substance which Agent Carter then field tested. The substance was positive for the presence of cocaine. The [CI] stated that Perry Booker met him in the doorway of the residence. The [CI] purchased $50.00 worth of crack cocaine from Perry Booker. The [CI] stated that Perry Booker retrieved the alleged crack cocaine from his person, which was in a brown glass pill type bottle with a white cap. The bottle was full of what appeared to be crack cocaine. After completing the purchase, Booker went back inside the residence. The [CI] described the residence as a beige colored single wide mobile home in the line of the other residences and that there were several pit bull type dogs tied outside the residence. It was further described as being at the end of the lane and was turned parallel [sic] to the lane, which was ninety degrees opposite of the other residences.

Furthermore, Booker filed a renewed motion to compel, moving the court to compel the government to reveal the identity of the CI because (1) the CI's

reliability was "at the center" of Booker's suppression motion, and (2) Booker was challenging in his suppression motion whether the affiant revealed to the magistrate all of the facts relating to the CI's reliability. Booker contended that this disclosure was necessary because (1) the CI's statements on the controlled buy were uncorroborated by law enforcement officials, (2) Booker was intending to assert the "it wasn't me" defense, (3) one of Booker's relatives would testify that Booker's cousin was in Booker's residence the same day of the search, (4) the CI was not shown a photograph array in determining the identification of the person involved in the controlled buy, and (5) the risk of retaliation against the CI was minimal because Booker was being detained pretrial.

In a combined order, the court denied both Booker's renewed motion to compel and his motion to suppress. The court first explained that, because "the record [was] sufficient to resolve the question presented," it was denying Booker's request for a suppression hearing. The court next determined that the affidavit for the search warrant established the CI's reliability, and the issuing magistrate had a substantial basis for concluding that probable cause for the search existed, because the CI gave first-hand information that (1) he had purchased drugs from Booker on numerous occasions; (2) these transactions occurred at Booker's residence, which

the CI described in detail; and (3) Booker retrieved the cocaine base from "a brown pill bottle with a white cap that was on his person."

The court also explained that this information was corroborated by the officers' search of the CI and his vehicle before the controlled buy, their observations of the CI walking to Booker's residence, their immediate debriefing of the CI after the controlled buy, and the positive field test of the substance the CI had purchased from Booker. In addition, the court determined that a "presumption of validity" existed with respect to the affidavit, and that Booker had to assert more than conclusory allegations of omitted facts to warrant a hearing on the issue. Finally, the court determined that Booker's motion to compel was meritless because the government did not intend to call the CI as a trial witness, and because Booker had not shown that the CI's testimony would significantly aid in establishing an asserted defense.

During a two-day trial, Agent Carter testified that, on July 16, 2003, he and other law enforcement officers executed a search warrant for Booker's residence.[1] After no-one answered his "knock and announce," Agent Carter forced open the

---

[1] Prior to the introduction of testimony, the parties stipulated that (1) the defendant was a convicted felon at the time of the instant offense; (2) the expert testimony of Katrina Warren, a forensic scientist, was accurate in concluding that substances tested were cocaine base and marijuana; and (3) the three firearms that were listed in Booker's indictment were (i) not manufactured in the State of Alabama, (ii) within the definition of 18 U.S.C. § 921(a)(3), and (iii) found to be in working order.

front door of Booker's residence and entered it. Noting that the television set and air conditioning were running, Agent Carter conducted an initial safety sweep of the residence to determine whether anyone was inside it. Although he did not locate anyone during this sweep, he observed two shotguns and one rifle in an open closet in the master bedroom, which he identified at trial. During a further search of this closet, Agent Carter recovered (1) bags containing cocaine base and marijuana from a "trough"; (2) a man's watch box containing $780 in cash from the top shelf; and (3) a receipt in the name of Carlos Booker, Booker's first cousin.

Agent Carter further testified that he observed in the master bedroom a small bed and a large tub containing men's clothes. In a second bedroom, which did not contain a bed, Agent Carter recovered a box with papers and letters addressed to or from Perry Booker. He recovered from the den and kitchen areas Perry Booker's high school equivalency ("GED") diploma, a plastic bag containing 13 smaller bags of a substance that appeared to be powder cocaine, and a brown glass medicine bottle that appeared to contain cocaine-base residue, but did not test positive for this substance. Other evidence Agent Carter recovered containing Perry Booker's name included (1) a utility bill from another area of the residence, and (2) a lease agreement for the residence from Booker's vehicle.

7

Finally, Agent Carter testified that, during this search, Carlos and Perry Booker drove up to the residence in Carlos Booker's vehicle. After Perry Booker denied living at the trailer, Agent Carter recovered from Booker's pocket keys that opened the front door of the trailer, a receipt for rent for the month of July for the trailer, and another utility-bill receipt. Although officers also recovered from Carlos Booker's vehicle a .9 mm pistol and finger scales, the officers only arrested Perry Booker. Agent Carter stated that the cocaine base the officers recovered from Booker's residence had a total weight of 1.42 grams and a street value of approximately $500.[2]

At the conclusion of the government's case, Booker moved for a judgement of acquittal, pursuant to Fed.R.Crim.P. 29. Booker argued that the government had failed to prove either that he had the intent to distribute drugs, or that he had knowingly and willfully possessed the firearms. The court summarily overruled this motion.

---

[2] Over Booker's objection, the government also introduced the testimony of Mitch Stuckey, the chief investigator with the Monroeville Police Department, for the limited purpose of testifying to prior acts to establish Booker's intent to distribute cocaine base in Count 2 of his indictment. Officer Stuckey stated that, on May 8, 1998, he executed a search warrant at Booker's residence and recovered approximately one ounce of cocaine and cocaine base, marijuana, drug paraphernalia, a pistol, a rifle, and $900 in cash. During this search, Officer Stuckey also recovered from Booker's person over $600 in cash.

Booker then called in defense his sister, Lois Booker, who testified that, at the time of Booker's arrest, she had been visiting family in Monroeville and staying with Booker. Lois Booker testified that, on July 15, 2003, the day before the search at issue, she had returned to Booker's residence after running errands, had not been able to come inside, but had seen Carlos Booker's vehicle outside and someone looking at her through the blinds. In addition, Lois Booker stated that she never saw drugs or firearms in Booker's residence.

Diane Rivers also testified for the defense, stating that she owned the trailer that Booker was renting and using as his residence at the time of his arrest, and that she did not believe that anyone else was living there. On July 16, 2003, the day of the arrest, she saw Carlos Booker at the trailer. She later observed officers knock down the door of this trailer, and she saw Perry Booker return to the trailer as a passenger in Carlos's red car. After Booker was arrested, Rivers observed the officers talk to Carlos Booker for approximately one hour. In addition, Rivers stated that she never had observed Booker with either firearms or drugs, and she did not believe he had been dealing drugs from the trailer. At the conclusion of its evidence, the defense renewed its Rule 29 motion, which the court again summarily denied. The jury ultimately was dead-locked on the § 841(a)(1) offense, but it found Booker guilty of the § 922(g)(1) offense.

9

The probation officer preparing Booker's presentence investigation report ("PSI") calculated his base offense level as 20, pursuant to U.S.S.G. § 2K2.1(a)(4). The probation officer also recommended a two-level upward adjustment, pursuant to U.S.S.G. § 2K2.1(b)(1)(A), because the offense involved between three and seven firearms, and a four-level upward adjustment, pursuant to U.S.S.G. § 2K2.1(b)(5), because Booker used or possessed the firearms in connection with another felony offense. With an adjusted offense level of 26 and a criminal history category of III, Booker had a guideline range of 78 to 97 months' imprisonment.

In addition to objecting to the PSI's summary of the offense conduct, Booker contended that the PSI's recommended four-level § 2K2.1(b)(5) enhancement, which was based on the judicially determined fact that Booker possessed drugs with the intent to distribute them, would result in a Blakely violation. Booker also again argued that the court should compel the government to identity the CI, or at least to conduct an in camera review of this fact, because (1) the CI was the only person who claimed to have first-hand knowledge about Booker's alleged possession of drugs; and (2) if the CI was Carlos Booker, this fact might be exculpatory and would constitute mitigating evidence at sentencing.

In response to Booker's renewed motion to compel, the government contended that (1) it did not intend to call the CI as a witness at sentencing, (2) the

10

CI had no information about the offense of conviction, and (3) Booker had failed to explain how the CI's identity could be relevant or helpful to him for sentencing purposes. The government, concluded, as such, that the identity of the CI was irrelevant, and that the court should deny Booker's renewed motion to compel. Moreover, the government responded that Booker's Blakely argument was without merit because Blakely did not apply to the federal guidelines.

At Booker's first sentencing hearing, he renewed his motion to compel the government to disclose the CI's identity, arguing that he believed that (1) Carlos Booker was the CI, and (2) the drugs belonged to Carlos. The government responded that Carlos Booker was not the CI, and that the government (1) had "terminated" its use of this CI after learning that he was in possession of cocaine, (2) might have a warrant for his arrest, and (3) did not know his location. The court then questioned "whether there [was] any need to keep [the CI's] identity confidential, since he [was] no longer being used and there [was] no need to protect him . . . for law enforcement purposes." Nevertheless, the court determined, based on the trial evidence and testimony about Booker's 1998 drug-trafficking activity, that the § 2K2.1(b)(5) enhancement was appropriate. The court then granted Booker a continuance to review the trial testimony.

11

On July 20, 2004, when the court reconvened Booker's sentencing hearing, Booker renewed his motion to compel, stating that he had learned that the CI might have died of an overdose. Booker also raised a <u>Blakely</u> challenge to his § 2K2.1(b)(5) enhancement. The court denied both of these motions, explaining that the identity of the CI did not impact Booker's potential sentence, and that the Supreme Court's decision in <u>Blakely</u> was not applicable to the federal guidelines. Booker objected to this ruling, arguing that the trial evidence did not establish that Booker (1) knowingly possessed the drugs recovered from his residence, or (2) knowingly possessed the firearms "in connection with" the drug offense. After giving Booker the opportunity to allocute, the court sentenced him to 84 months' imprisonment, 3 years' supervised release, and a $100 special assessment fee.

**Issue 1:     <u>Pretrial motion for the government to reveal the identity of the CI</u>**

Booker argues that the court abused its discretion in failing to grant his motion to compel the government to disclose the identity of the CI because the balance between the government's interest in withholding this identity and Booker's interest in asserting his defense "tipped" in Booker's favor. Booker explains that, because the CI played an "active, prominent role" in the criminal activity, his potential testimony bore a direct relationship on Booker's defenses of "I wasn't there" and "it wasn't me." Booker also contends that, contrary to the

12

court's determination, the fact that the government did not intend to call the CI at trial was not relevant to the determination. Moreover, Booker argues that the government failed to show that it had a compelling justification to keep the CI's identity confidential.

We review the denial of a motion to disclose the identity of a CI for abuse of discretion. United States v. Gutierrez, 931 F.2d 1482, 1490 (11th Cir. 1991). Although the government has the privilege to withhold from disclosure the identity of its informants, this privilege is limited. Id. In Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court set forth a balancing test, whereby a court must consider the particular circumstances of each case, the crime charged, the possible defenses, and the potential significance of the CI's testimony. Id., 353 U.S. at 62, 77 S.Ct. at 628. If disclosure is "relevant and helpful to the defense of the accused, or is essential to a fair determination of a cause, the privilege must give way." Id. at 60-61, 77 S.Ct. at 627-28.

In Gutierrez, we further discussed that, in applying the Roviaro balancing test, courts focus on three factors: "the extent of the [CI's] participation in the criminal activity, the directness of the relationship between the defendant's asserted defense and the probable testimony of the [CI], and the government's interest in nondisclousre." Gutierrez, 931 F.2d at 1490 (quotation omitted). After

13

the government in Gutierrez acknowledged that the CI's participation was substantial, instead of consisting of his being "a mere tipster," we examined the correlation of the asserted defense with the CI's probable testimony. Id. at 1490-91. Moreover, explaining that the defendant had the burden of showing "that the [CI's] testimony would significantly aid in establishing an asserted defense," and that "[m]ere conjecture about the possible relevance of [the CI's] testimony is insufficient to compel disclosure," we concluded that, although the CI was the only witness who could refute the officers' testimony, the defendant failed to show that the CI's testimony would contradict overwhelming evidence of the defendant's guilt. Id. at 1491. After we also determined that some of the appellants may have threatened the CI, we concluded that the defendants failed to show that the district court abused its discretion in denying their motions to compel the identity of the CI. Id.

In United States v. Rutherford, 175 F.3d 899 (11th Cir. 1999), we examined an appeal of drug-trafficking convictions, in which the defendant claimed that "it wasn't me," that is, that he had been misidentified during a controlled buy because, contrary to other evidence, the officers involved in the buy did not indicate that the defendant walked with a limp. See id. at 902. We determined that the defendant established a direct relationship between his defense and the

informants' proffered testimonies because there may have been a misidentification, and because the informants were in a better position to identity the man they took to the drug deal than the government agents who first met the defendant at the buy and only identified the defendant from a photograph.  Id. Thus, we remanded the case for the court to conduct an in camera hearing to determine, in the first instance, what the informants' testimonies would entail.  Id.

Unlike the facts in Rutherford, the CI's testimony here only would have been relevant for establishing whether the government had probable cause to search Booker's residence.  Thus, even taking as true Booker's defense that "it wasn't me," and that the CI was mistaken as to the identity of the person who sold him cocaine base during the controlled buy, this fact would not have affected whether the government established probable cause to believe that drugs would be found at that residence.[3]  Moreover, as the district court concluded, the CI's identity and possible testimony as to the controlled drug buy did not relate to whether Booker knowingly possessed firearms.  Applying the applicable balancing test, therefore, Booker failed to show "that the [CI's] testimony would

---

[3] To the extent Booker argued in the district court that the disclosure of the CI's testimony was necessary because the affiant may have omitted facts pertaining to the CI's reliability, Booker has not discussed this argument on appeal.  We, therefore, conclude that he has abandoned it.  See United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) ("a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. Otherwise, the issue—even if properly preserved at trial—will be considered abandoned").

significantly aid in establishing an asserted defense." See Gutierrez, 931 F.2d at 1490-91. In addition, Booker had threatened to retaliate against the CI. Thus, the district court did not abuse its discretion in denying Booker's motion to disclose the identity of the CI. See Gutierrez, 931 F.3d at 1490.

**Issue 2:      Pretrial motion to suppress evidence**

Booker also argues that the court erred in denying his motion to suppress evidence seized from his residence because the affidavit supporting the warrant for this search failed to state sufficient facts to establish that the CI's information was reliable. Booker contends that the limited information Agent Carter included in the affidavit on Agent Carter's past relationship with the CI did not show that the CI was reliable. Booker also argues that, although reliability and veracity can be established, alternatively, through police corroboration or evidence that the CI's knowledge was specific, these factors were absent in this case as well. In addition, Booker contends that the court erred by not conducting an evidentiary hearing on his motion before denying it because (1) Booker's sister could have testified that he left his residence prior to the controlled buy; (2) the record was unclear on whether law enforcement officers actually witnessed the controlled buy; and

16

(3) only the CI could state that he bought drugs from Booker, instead of from someone else with access to the Booker's trailer.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." United States v. Heard, 367 F.3d 1275, 1278 (11th Cir.) (quotation omitted), cert. denied, 125 S.Ct. 235 (2004). "We review the district court's factual findings for clear error and its application of law to the facts de novo, viewing all facts in the light most favorable to the party that prevailed in the district court." Id. Moreover, although the challenged search here was conducted by local law enforcement officials and pursuant to a state warrant, "[i]t is established law of this Circuit that the admissibility in federal court of the products of state searches and seizures is controlled by federal law." See United States v. Clay, 355 F.3d 1281, 1283 (11th Cir.) (citation omitted), cert. denied, 125 S.Ct. 626 (2004).

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). We give "[g]reat deference" to a district court judge's determination of probable cause. Id. (quotation omitted). Citing to

Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), we have

explained that:

> Probable cause is a fluid concept—turning on the assessment of
> probabilities in particular factual contexts.  To avoid rigid legal rules,
> Gates changed the two-pronged test of Aguilar v. Texas, 378 108,
> 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964), into a totality of the
> circumstances test.  Under the Gates totality of the circumstances test,
> the veracity and basis[-]of[-]knowledge prongs of Aguilar, for
> assessing the usefulness of an informant's tips, are not independent.
> They are better understood as relevant considerations in the totality of
> the circumstances analysis that traditionally has guided probable
> cause determinations: a deficiency in one may be compensated for by
> a strong showing as to the other.

Brundidge, 170 F.3d at 1352-53 (internal quotations and marks omitted).

In Brundidge, the defendant argued that the search warrant at issue was not

supported by probable cause because the affidavit for the warrant failed to reflect

independent police corroboration of the CI's story.  Id. at 1353.  In rejecting this

argument, we discussed that independent police corroboration is not required in

every case; the government had established the CI's veracity; and the CI's basis of

knowledge was good, as evidenced by his detailed description of the sale of drugs.

Id.  We also explained that (1) the CI's basis of knowledge made up for any

weaknesses in his veracity; and (2) the level of detail in the CI's story meant that

the CI was unlikely to lie because, "if the warrant issued, lies would likely be

18

discovered in short order." Id. at 1353-54 (quoting United States v. Foree, 43 F.3d 1572, 1576 (11th Cir. 1995)).

Here, Agent Carter merely provided in the affidavit supporting the search warrant at issue that the CI had provided Agent Carter "with accurate and reliable information in the recent past." Because Agent Carter failed to provide more details about the CI's prior cooperation, Agent Carter's allegation that the CI was reliable was "entitled to only slight weight." See Foree, 43 F.3d at 1575-76 (reasoning that, although an averment that the CI had provided reliable information in the past was preferable to a "bald assertion" that the CI was a "reliable information," it still "le[ft] the nature of that [past] performance undisclosed, so that the judicial officer making the probable cause determination ha[d] no basis for judging whether the [affiant's] characterization of [the CI's past] performances [was] justified"). Moreover, other than searching the CI before and after the controlled buy, watching him enter and exit the residence in question, and field testing the substance the CI received during the buy, the affiant did not independently verify the CI's testimony before seeking the warrant.

Nevertheless, the CI told the affiant that he had completed numerous purchases of crack cocaine from the defendant at the particular address listed in the warrant. Moreover, following the controlled buy, the CI told the affiant that

19

(1) Booker met him at the doorway of the residence, (2) the CI purchase $50 worth of cocaine base from Booker, (3) Booker retrieved the alleged cocaine based from his person, (4) this substance was in a "brown glass pill type bottle with a white cap," and (5) this bottle was full of what appeared to be cocaine base. The CI also described the residence as being a beige-colored single-wide mobile home in the line of other residences, that there were several pit-bull type dogs tied outside the residence, and that it was in a parallel position at the end of the lane. Thus, similar to the facts in Brundidge, the veracity of the CI's testimony was established by his detailed account of the undercover buy, and this level of veracity compensated for the CI's lack of "basis of knowledge." See Brundidge, 170 F.3d at 1353-54. The district court, therefore, did not err, after examining the totality of the circumstances, in concluding that the warrant was supported by probable cause and in denying Booker's suppression motion. See Heard, 367 F.3d at 1278; see also Brundidge, 170 F.3d at 1352-53.[4]

---

[4] To the extent Booker also has preserved his argument that the court erred in not conducting an evidentiary hearing before denying his suppression motion, we review a district court's denial of a request for an evidentiary hearing for abuse of discretion. See United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000). A search warrant may be voided if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth, including material omissions. See Dahl v. Holley, 312 F.3d 1228, 1235 (11th Cir. 2002) (citing Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978)). Nevertheless, "[w]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion." See Cooper,

**Issue 3:**     <u>Sufficiency of the evidence</u>

Booker argues that the trial evidence was insufficient to support his

§ 922(g)(1) conviction because the jury could not have inferred reasonably that he

knowingly possessed the firearms at issue. Booker specifically contends that the

government failed to present direct evidence linking him with the firearms. He

also contends that evidence supporting his argument that the firearms, instead,

were possessed by Carlos Booker included that (1) Lois Booker, who was staying

at his residence, did not see the firearms; and (2) his neighbor saw Carlos alone at

the residence the day before and on the same day that the firearms were recovered.

"Whether there was sufficient evidence to support a conviction is a question

of law subject to <u>de novo</u> review." <u>United States v. Alaboud</u>, 347 F.3d 1293, 1296

(11th Cir. 2003). "In assessing the sufficiency of the evidence, we view the

evidence in the light most favorable to the government with all reasonable

inferences and credibility choices made in the prosecution's favor." <u>Id.</u> "A jury's

verdict must be sustained against such a challenge if 'any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.'"

203 F.3d at 1285 (upholding court's denial of suppression hearing because defendant only "promise[d]" to prove at the hearing something he did not allege in his suppression motion). Because Booker, like the defendant in <u>Cooper</u>, failed to allege facts supporting his conclusory argument that the affiant omitted facts relevant to the determination of probable cause, or that, if taken as true, would have required grant of relief, the district court also did not abuse its discretion in denying Booker a suppression hearing.

21

Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Furthermore, we have concluded that [c]redibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). Where testimonies are in direct conflict, a fact finder's choice of whom to believe "is conclusive on the appellate court unless the [fact finder] credits exceedingly improbable testimony." Id. (emphasis in original) (citation and other internal markings omitted).

Under § 922(g)(1), it is unlawful for a felon to possess a firearm. See 18 U.S.C. § 922(g)(1). To prove a § 922(g)(1) violation, the government must show beyond a reasonable doubt "(1) that [the defendant] was a convicted felon; (2) that [the defendant] knew he was in possession of a firearm; and (3) that the firearm affected or was in interstate commerce." United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004), cert. denied, No. 04-9034 (U.S. April 4, 2005). Under this second element—the only one contested by Booker—the government need not prove actual possession. See id. Instead, the government may show knowledge through constructive possession. Id.; see also United States v. Winchester, 916 F.2d 601, 603-04 (11th Cir. 1990) (holding firearm found behind couch when

22

defendant not home sufficient for § 922(g)(1) conviction). To establish constructive possession, "the government must produce evidence showing ownership, dominion, or control over the contraband itself . . . or the [location] in which contraband is concealed." Wright, 392 F.3d at 1273 (quotation omitted).

In United States v. Pedro, 999 F.2d 497 (11th Cir. 1993)—the case Booker cites in support of his insufficiency argument—we examined a § 922(g)(1) conviction following evidence at trial that a police officer responding to a crime-in-progress call of a burglary of an apartment observed the defendant exit that apartment behind another man who was carrying a hard-covered suitcase. Id. at 498. When the officer opened this suitcase, he recovered several items that had been stolen from the apartment, along with two knives and a firearm. Id. at 499. Explaining that a defendant's "mere presence in the area of an object or awareness of its location is not sufficient to establish possession," and that the government had offered no evidence linking the defendant to the firearm, we concluded that the government had failed to prove beyond a reasonable doubt that the defendant had both the intent and power to exercise control over the firearm. Id. at 500-02.

On the other hand, in the instant case, by presenting testimony from Agent Carter that he recovered from the residence in question a box containing papers and letters addressed to or from Booker, Booker's GED diploma, and a utility bill

with the address of the residence in Booker's name, the government showed that Booker was renting and living in the residence in which they seized the firearms in question. Evidence at trial included testimony from Agent Carter that he recovered from Booker's vehicle a lease agreement for the residence, and testimony from Rivers that Booker was renting this residence at the time of his arrest and was the only person living there. Agent Carter also testified that he saw the firearms in the closet in the master bedroom during his initial safety sweep of the trailer. In addition, the jury heard testimony that Booker initially denied living at the residence, despite that he had keys and a rent receipt in his pocket. Therefore, unlike the facts in Pedro, the government established evidence linking Booker to the firearms and more than "mere presence" in the vicinity of them. Cf. Pedro, 999 F.2d at 500-052.

In addition, although Booker introduced testimony from Lois Booker that she was a guest in the residence at the time of his arrest and did not see the firearms, and testimony from Rivers that she saw Carlos Booker at the trailer prior to the arrest, and that she had never seen Perry Booker with firearms, we do not reweigh the jury's credibility determinations. See Ramirez-Chilel, 289 F.3d at 749. Moreover, although Booker argues that the evidence shows that Carlos Booker placed the firearms in closet of the master bedroom, "it is not necessary

24

that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." See United States v. Vazquez, 53 F.3d 1216, 1224 (11th Cir. 1995) (quotation omitted). Because, viewing the evidence in the light most favorable to the government, a rational trier of fact "could have found the essential elements of [Booker's § 922(g)(1) offense] beyond a reasonable doubt," his conviction was supported by sufficient evidence. See Alaboud, 347 F.3d at 1296. We affirm Booker's § 922(g)(1) conviction.

**Issue 4:      Sentencing**

Finally, Booker argues that the court committed a Blakely violation when it enhanced his sentence under § 2K2.1(b)(5), based on judicial findings of fact made at sentencing. In a brief he prepared prior to the Supreme Court's decision in Booker, he contends that the Supreme Court's holding in Blakely also should preclude federal courts from applying the federal guidelines.

Because Booker timely raised a Blakely objection in the district court, we review his Blakely/Booker claim on appeal de novo, but reverses only for harmful error. See United States v. Paz, No. 04-14829, manuscript op. at 4 (11th Cir. April 5, 2005) (citation omitted). "To find harmless error, we must determine that the error did not affect the substantial rights of the parties." Paz, No. 04-14829, manuscript op. at 5 (quotation omitted). We further explained in Paz as follows:

25

> A constitutional error, such as a <u>Booker</u> error, must be disregarded as not affecting substantial rights, if the error is harmless beyond a reasonable doubt. This standard is only met where it is clear beyond a reasonable doubt that the error complained of did not contribute to the sentence obtained. The burden is on the government to show that the error did not affect the defendant's substantial rights.

<u>Id.</u> (internal quotations and marks omitted).

In <u>Apprendi</u>, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Apprendi</u>, 530 U.S. at 490, 120 S.Ct. at 2362-63. After the continuation of Booker's sentencing hearing, the Supreme Court revisited that rule in <u>Blakely</u>, in the context of Washington state's sentencing guideline scheme, and clarified that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose <u>solely on the basis of the facts reflected in the jury verdict or admitted by the defendant</u>. . . . In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose <u>without</u> any additional findings." <u>Blakely</u>, 542 U.S. at ___, 124 S.Ct.at 2537 (emphasis in original). Applying these principles, the Court held that Blakely's sentence—which was enhanced under the state guidelines based on the sentencing court's additional finding by a preponderance

26

of the evidence that Blakely committed his kidnaping offense with deliberate cruelty—violated the Sixth Amendment. Id. at ___, 124 S.Ct. at 2534-38.

While the instant case was pending on appeal, the Supreme Court issued its decision in Booker, finding "no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures at issue" in Blakely. Booker, 543 U.S. at ___, 125 S.Ct. at 749. Resolving the constitutional question left open in Blakely, the Supreme Court held that the mandatory nature of the federal guidelines rendered them incompatible with the Sixth Amendment's guarantee to the right to a jury trial. Id. at ___,125 S.Ct. at 749-51. In extending its holding in Blakely to the Guidelines, the Court explicitly reaffirmed its rationale in Apprendi that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at ___, 125 S.Ct. at 756.

In a second and separate majority opinion, the Court in Booker concluded that, to best preserve Congress's intent in enacting the Sentencing Reform Act of 1984, the appropriate remedy was to "excise" two specific sections—18 U.S.C. § 3553(b)(1) (requiring a sentence within the guideline range, absent a departure) and 18 U.S.C. § 3742(e) (establishing standards of review on appeal, including de

27

novo review of departures from the applicable guideline range)—thereby effectively rendering the Sentencing Guidelines advisory only. Id. at ___, 125 S.Ct. at 764. Thus, the guidelines range is now advisory; it no longer dictates the final sentencing result but instead is an important sentencing factor that the sentencing court is to consider, along with the factors contained in 18 U.S.C. § 3553(a).[5] Id. at ___, 125 S.Ct. at 764-65).

Following the Supreme Court's decision in Booker, on remand, we re-examined in United States v. Reese, 397 F.3d 1337 (11th Cir. 2005), a defendant's sentence that had been enhanced, over objection, because the defendant possessed a firearm in connection with another felony. Id. at 1337. Concluding that the defendant's sentence was in violation of the Sixth Amendment, we vacated and remanded his case and ordered resentencing consistent with the Supreme Court's opinions in Booker. Id. at 1338.

_____

[5] These other relevant factors in § 3553(a) include: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed–(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for . . . (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .; (5) any pertinent policy statement []; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." See 18 U.S.C. § 3553(a)(1)-(7).

In Paz, we similarly examined a Blakely/Booker challenge to a six-level enhancement based on the district court's factual finding, which was not admitted by the defendant, that the amount of loss from the defendant's offense of conviction was between $30,000 and $70,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(D). Paz, No. 04-14829, manuscript op. at 2. We determined that, because the defendant's sentence was enhanced, under a mandatory guidelines system, based on facts found by the judge and not admitted by the defendant, the defendant's Sixth Amendment right to a jury trial was violated. Id. at 5. Moreover, we concluded that the government could not show that this error was harmless beyond a reasonable doubt because it was evident from the sentencing transcript that, had the court used the guidelines in an advisory fashion, Paz's sentence would have been shorter. Id. at 6.[6] We concluded, as such, that the constitutional error affected the defendant's substantial rights, and it remanded for resentencing consistent with Booker. Id.

Booker's PSI recommended a four-level increase, pursuant to § 2K2.1(b)(5), because Booker used or possessed firearms in connection with another felony offense, that is, possession with intent to distribute cocaine. See

---

[6] During the defendant's sentencing hearing in Paz, the district court explicitly stated that, if the guidelines were found unconstitutional, if would have sentenced the defendant to a shorter term of imprisonment. See Paz, No. 04-14829, manuscript op. at 4.

U.S.S.G. § 2K2.1(b)(5) (providing for a four-level increase in offense level if the defendant used or possessed any firearm or ammunition "in connection with" another felony offense). Booker never conceded, and the jury did not find beyond a reasonable doubt, that he committed this drug offense. Thus, in calculating Booker's sentence under a mandatory guideline system, the court relied on facts not admitted by him or found by a jury beyond a reasonable doubt and, thus, violated the Sixth Amendment. See Booker, 543 U.S. at ___, 125 S.Ct. at 756; see also Paz, No. 04-14829, manuscript op. at 5.[7]

Furthermore, as the government concedes, it cannot show that this Blakely/Booker error did not affect Booker's substantial rights and, thus, was harmless. Unlike the facts in Paz, the district court did not state that it would have imposed a lighter sentence but for the mandatory nature of the federal guidelines. However, as discussed above, the government only can show that error was harmless if "it is clear beyond a reasonable doubt that the error complained of did not contribute to the sentence obtained." See Paz, No. 04-14829, manuscript op. at 5. In this case, the government has not made such a showing. Thus, similar to

_____

[7] The district court also enhanced Booker's offense level by two levels, pursuant to § 2K2.1(b)(1)(A), because the offense involved between three and seven firearms. No Blakely/Booker error resulted from this enhancement, however, because Booker's indictment specifically charged him with possessing three firearms.

30

the facts in <u>Reese</u> and <u>Paz</u>, we conclude that <u>Blakely</u>/<u>Booker</u> error occurred here, and that it was not harmless.  <u>See</u> <u>Reese</u>, 397 F.3d at 1338; <u>see also</u> <u>Paz</u>, No. 04-14829, manuscript op. at 6.

Accordingly, we conclude that the district court did not commit reversible error in denying Booker's motions for the government to reveal the identity of the CI and to suppress evidence seized as the result of a search of Booker's residence. Furthermore, we conclude that the evidence at trial was sufficient to support Booker's § 922(g)(1) conviction for possessing a firearm as a convicted felon. We, therefore, affirm Booker's conviction.  However, because the district court treated the federal guidelines as mandatory in sentencing Booker, and because the government has not shown that this error was harmless, we vacate and remand Booker's sentence for resentencing consistent with <u>Booker</u>.

**AFFIRMED IN PART; VACATED AND REMANDED FOR RESENTENCING.**